**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **Demond Smith-Cheatham,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 26-cv-_____** |
| | : | |
| | : | **Jury Trial Demanded** |
| **City of Philadelphia; Officer Santiago;** | : | |
| **Officer Washington; and John Does 1-9,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**COMPLAINT**

## I.    Introduction

1.      In the late night to early morning hours between February 9 and 10, 2025, during a celebration of the Philadelphia Eagles Superbowl win, Philadelphia police officers assaulted Plaintiff Demond Smith-Cheatham, striking him in the head with a baton and leaving him bleeding for twenty minutes before they falsely arrested him to retroactively justify their excessive use of force.

2.      Defendants Santiago, Washington, and John Does 1-9 were aware that the Philadelphia Police Department ("PPD") had an ineffective disciplinary system and that they could commit misconduct without any real repercussions. Additionally, City officials were well aware that the PPD had a long history of using excessive force and unlawful arrests in response to mass gatherings and took no steps to intervene in the inevitable constitutional violations which occurred.

3.       Aware of this background, Defendants John Does 1-9, Santiago, and Washington acted with impunity when they violently attacked and falsely arrested Smith-Cheatham in violation of his Fourth and Fourteenth Amendment Rights.

4.       As a result of these violations, Smith-Cheatham suffered substantial harms and losses, including physical pain and suffering, emotional trauma, and loss of liberty. Smith-Cheatham brings this action asserting claims under 42 U.S.C. § 1983 to hold defendants accountable for these violations of his civil rights.

## II.    Jurisdiction

5.       This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

6.       This Court is the proper venue in this matter because the events giving rise to the claims occurred within the Eastern District of Pennsylvania.

## III.    Parties

7.       Plaintiff Demond Smith-Cheatham is a 29-year-old former National Guardsman and resident of Philadelphia, Pennsylvania.

8.       Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department, which, at all times relevant to this Complaint, employed the below individual defendants.

9.       Defendant Officer Santiago was, at all times relevant to this Complaint, a police officer employed by the City of Philadelphia who acted under the direction of the City of Philadelphia and was directed to take plaintiff to the Temple University Hospital on February 10, 2025. He is sued in his individual capacity.

10. Defendant Officer Washington was, at all times relevant to this Complaint, a police officer employed by the City of Philadelphia who acted under the direction of the City of Philadelphia and was directed to take plaintiff to the Temple University Hospital on February 10, 2025. He is sued in his individual capacity.

11. Defendants John Does 1-9 were, at all times relevant to this Complaint, law enforcement officers employed by the City of Philadelphia who acted under the direction of the City of Philadelphia. They are sued in their individual capacities. Plaintiff does not know the correct names of these defendants and will seek leave to amend this pleading to properly name the defendants after the completion of preliminary discovery.

12. At all times relevant to this Complaint, the defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to plaintiff.

13. At all times relevant to this Complaint, all defendants acted under color of state law.

## IV. Facts

### A. Eagles Win, The Celebration, and the Police Response

14. On February 9, 2025, the Philadelphia Eagles defeated the Kansas City Chiefs to win the 2025 Super Bowl.

15. As often occurs after a major Eagles win, Philadelphians and Eagles fans travelled to Broad Street to celebrate the victory.

16.     The PPD, expecting such a gathering, blocked streets, allowing the celebration to occur uninterrupted by traffic.[1] Police had frequently done so after Eagles games in anticipation of such events, and this practice was well known by members of the public.

17.     Smith-Cheatham joined in the festivities and began walking down Broad Street alongside his partner, his family, his friends, and fellow celebrating fans.

18.     Smith-Cheatham walked south on Broad Street from North Philadelphia toward Race Street. At the intersection of those two streets, the crowd stopped and encountered a line of Philadelphia police officers. Police had set up barricades which prevented additional people from joining a larger mass of people that had gathered near City Hall.

19.     At that location, PPD officers began to employ aggressive crowd control tactics.

**B.      The Beating of Smith-Cheatham**

20.     Smith-Cheatham was standing on a median on Broad Street when police gave an order to disperse. Smith-Cheatham immediately followed their orders and began walking toward the west side of the sidewalk so that he could leave.

21.     A mass of people on the street began frantically looking for ways to comply with the order. A line of PPD officers riding motorcycles began moving forward and pushing fans north, away from City Hall.

22.     The police line began to form a U shape in which officers on bicycles and patrol officers on foot pushed further ahead on the sidewalks while the officers on motorcycles remained in the center to push the crowd further north.

---

[1] Celia Bernhardt, *Philly's Game Plan: How the city is preparing for Super Bowl Celebrations*, WHYY (Feb. 6, 2025), https://whyy.org/articles/philadelphia-super-bowl-preparations-safety-police/

23. Despite Smith-Cheatham's attempts to leave, an officer on a motorcycle revved the vehicle's engine and lurched forward, hitting Smith-Cheatham's foot.

24. Smith-Cheatham approached John Doe 1, a police supervisor wearing a white shirt, to complain about the officer hitting his foot. John Doe 1 ignored these complaints and told Smith-Cheatham to keep moving north.

25. At this point, John Doe 2, a police officer with a bicycle standing nearby, began yelling at Smith-Cheatham and said, "I'll fuck you up."

26. At that time, the entire crowd was pushed further north past Race Street and continued walking for a few blocks.

27. As Smith-Cheatham moved with the crowd, John Doe 2 singled out Smith-Cheatham and continued shouting verbal insults at him. Eventually, John Doe 2 escalated this interaction by grabbing and pushing Smith-Cheatham.

28. As a result of this encounter, John Doe 2 lost his balance and fell.

29. Smith-Cheatham immediately felt a baton swung by John Doe 3 strike him in the forehead.

30. John Doe 3, joined by John Does 4-9, swarmed Smith-Cheatham and began beating him—again, striking him in the head with a baton.

31. Smith-Cheatham collapsed, falling to his knees and putting his hands up to cover his now wounded face.

32. Defendants John Does 3-9 continued to use physical force against him despite his lack of resistance.

33. One of the officers struck Smith-Cheatham in the back of the head causing Smith-Cheatham to fall against the ground, where he laid in a prone position.

34. John Doe 2 stood nearby and shouted expletives at Smith-Cheatham, taunting him.

35. At one point the officer called Smith-Cheatham—a Black man—the n-word and called him a "dickhead."

36. John Does 3-9 continued to use force against Smith-Cheatham until they eventually handcuffed him.

37. As this occurred, other officers began harassing and physically attacking Smith-Cheatham's friends and preventing them from coming to help the injured Smith-Cheatham.

**C.      The Aftermath of the Beating**

38.  John Does 3-9 sat Smith-Cheatham up, still handcuffed, and then left without getting him medical attention. A new set of officers arrived to replace them.

39. Bloodied and dazed, a wave of exhaustion fell over Smith-Cheatham. He was bleeding from his head and became frightened that if he fell asleep with head trauma, he may not wake up. He sat on the sidewalk struggling to stay awake for what he believed was close to twenty minutes.

40. At some point, Smith-Cheatham heard the newly arrived officers speaking amongst themselves and discussing what to do with him. He heard officers say they could not let him go after beating him and, even though he had committed no crime, they "had to book him." Other officers noted that because he was bleeding from his head, they had to get him medical attention.

41. The officers determined they would falsely charge him with disorderly conduct to cover up the unlawful use of force.

42.     Following this decision, Officers Santiago and Washington arrested Smith-Cheatham and took him to Temple University Hospital.

43.     There, doctors stitched and glued together two large gashes in Smith-Cheatham's scalp and treated him for various bruises and scrapes.

44.     Instead of releasing Smith-Cheatham, Officers Santiago and Washington took him from the hospital to PPD's Ninth Police District, where he spent the night in custody.

45.     Smith-Cheatham was released the following evening at around 6:00 p.m. without any paperwork and without receiving notice of charges for any crime.

46.     Smith-Cheatham suffered lasting physical injury—enduring the presence of two large scars on his forehead—and lasting emotional injury.

**D.      The City of Philadelphia's Responsibility for Smith-Cheatham's Harms and Losses**

47.     The unlawful conduct of defendants Santiago, Washington, and John Does 1-9 and the harms suffered by Smith-Cheatham are directly attributable to the affirmative decisions of City of Philadelphia policymakers and their deliberate indifference to the risk of constitutional violations.

**1.      The City's History of Abusive Response to Mass Gatherings**

48.     The actions by defendant police officers were the predictable result of the PPD's long history of abusive response to mass gatherings.[2]

---

[2] *See, e.g.,* Timothy J. Lombardo, Civil Rights and the Rise of Frank Rizzo in 1960s Philadelphia, 18(2) Pennsylvania Legacies 14-19 (2018) (detailing PPD's violent and aggressive tactics under Commissioner Frank Rizzo to suppress peaceful civil rights demonstrations in the 1960s); Francis X. Clines, *Many Charges Are Dismissed In G.O.P. Convention Protests*, The New York Times (Dec. 10, 2000), https://www.nytimes.com/2000/12/10/us/many-charges-are-dismissed-in-gop-convention-protests.html (describing PPD's widespread excessive force and unfounded, preemptive arrests in response to peaceful protests of the 2000 Republican National Convention).

49.     In recent years, the City has been woefully underprepared and utilized overly aggressive tactics in response to protests of police violence. In 2020, PPD brutalized hundreds of protesters using tear gas, pepper spray, and rubber bullets, and falsely arrested innocent participants and bystanders. The City paid over $9 million dollars to settle these cases.[3]

50.     PPD's tactics of utilizing pre-textual arrests and excessive force at mass gatherings is not limited to protests. PPD utilizes these same unlawful practices during parades and other celebratory gatherings.

51.     In 2012, a PPD Lieutenant was videotaped punching a woman at the Puerto Rican Day Parade. The Lieutenant then falsely arrested the woman to retroactively justify his assault. PPD refused to discipline the Lieutenant.[4]

52.     In 2018, PPD officers assaulted another Eagles fan while attempting to disperse a crowd of fans outside the stadium.[5] Officers attacked the fan, striking him several times in the head with a baton. Then, to justify their unlawful force, officers arrested and accused the fan of punching a police horse and assaulting officers. The fan was paid a settlement as a result of his civil lawsuit against the assaulting PPD officer.

---

[3] Treasure Welle, *Philadelphia Reaches $9.25 Million Settlement Over Police Misconduct During the 2020 George Floyd Protests*, CNN (Mar. 21, 2023), https://www.cnn.com/2023/03/21/us/philadelphia-police-misconduct-settlement

[4] On Demand News, *Police Officer Filmed Allegedly Punching Innocent Woman in Philadelphia*, (YouTube, Oct. 2, 2012), https://www.youtube.com/watch?v=gHYdHadL6eg; *see also Philadelphia Cop Who Punched Woman Gets Job Back*, ABC News (Aug. 12, 2013), https://6abc.com/archive/9203288/

[5] Nicholas Malfitano, *Settlement Reached in Case of Man Accused of Punching Philly Police Horse at 2018 Eagles NFC Championship Game*, Marino Associates, https://www.marinoassociates.net/settlement-reached-in-case-of-man-accused-of-punching-philly-police-horse-at-2018-eagles-nfc-championship-game/news-coverage/ (last accessed Apr. 28, 2026)

53.     In 2019, at the LGBTQ Pride Parade, a PPD officer attacked a passerby for trying to cross the street and then falsely arrested her to retroactively justify the assault.[6]

54.     In view of this history, by February 9, 2025, the City's policymakers knew and understood that, if they did not intercede, Philadelphia police officers would continue to engage in such misconduct during large gatherings.

### 2.     The City's Adoption of Plans to Aggressively Respond to the Eagles Super Bowl Win.

55.     After the Eagles won the Super bowl in 2018, Philadelphia police failed to appropriately control crowds massing in the streets. In response to these events, PPD decided to enhance crowd control measures, increasing the number of officers present at post-Eagles-victory celebrations.

56.     Just two weeks prior to the 2025 Super Bowl, an 18-year-old Temple University student died after falling from a light pole while celebrating an Eagles playoff win. This tragic incident was covered extensively in local media.[7]

57.     In response to this incident, the City developed operational plans to respond to crowds at future events. Police planned to utilize drones and helicopters to keep track of the crowds and hired extra personnel.[8]

58.     City officials and PPD leadership were well aware of the numerous, well-publicized prior incidents of Philadelphia police officers engaging in excessive force and

---

[6] *Wexler v. Hawkins*, No. CV 19-5760, 2024 WL 3251726, at *1 (E.D. Pa. June 21, 2024); *see also* Jeremy Roebuck, *Philly Police Officers Hit with $1M Civil Judgment for 2019 Pride Parade Assault*, The Philadelphia Inquirer (Jan. 24, 2024), https://www.inquirer.com/news/tzvia-wexler-excessive-force-philly-police-chairmaine-hawkins-james-koenig-20240124.html

[7] Bernhardt, *supra*, note 1.

[8] *Id*.

unlawful arrests in response to mass gatherings as described above and had reason to know that that the use of additional personnel would increase the likelihood of officer misconduct.

59.     Despite their knowledge and expectation of a large gathering after the Superbowl and a very recent fatality, by February 9, 2025, no one within PPD had taken steps to ensure that officers would respect the constitutional rights of civilians present at a public celebration.

60.     Instead, City and PPD officials directed officers to take aggressive crowd control measures.

61.     The misconduct causing plaintiff's injuries was the direct result of decisions of City policymakers to respond to mass gathering with aggressive tactics. These directives were communicated to officers throughout the PPD, including the individual defendants, or at minimum PPD officers were under the impression that there would be no consequences for the use of these violent and extreme tactics.

### 3.     The City's Failure to Supervise, Train, or Discipline Officers

62.     The City of Philadelphia has long failed to develop an effective disciplinary system to ensure their police officers do not violate citizens' constitutional rights.

63.     In 1996, litigation arising out of the 39th District scandal was initiated in *NAACP et al. v. City of Philadelphia*, No 96-6045 (E.D. Pa.). On the day the lawsuit was filed, the City, acknowledging that wholesale reform of PPD was necessary, entered into a wide-ranging Settlement Agreement.

64.     The City agreed to appoint an Integrity and Accountability Officer ("IAO") to monitor compliance with the Agreement. The agreed purpose of the IAO was to assess the PPD in several areas, including the absence of a functioning disciplinary system which resulted in officers and supervisors alike violating civilians' rights with impunity.

10

65.     Between 1997 and 2003, the IAO issued three reports on PPD's disciplinary system, including an evaluation of Internal Affairs. The IAO concluded that the system was fundamentally ineffective, inadequate, and unpredictable.

66.     The IAO cited serious and continuing deficiencies in critical areas, including the lack of consistent, rational, and meaningful disciplinary action and the failure to discipline substantial numbers of officers who were found to have engaged in misconduct.

67.     This failure to properly discipline officers has continued through more recent years. In 2018, a report revealed that many sustained allegations of violent misconduct resulted in no punitive action against Philadelphia police officers.[9] These included sustained allegations of officers pistol-whipping, threatening to murder, and assaulting civilians.

68.     As recently as 2025, the Philadelphia Citizens Police Oversight Commission described how PPD has failed to appropriately terminate problematic officers despite their cases involving "egregious misconduct such as excessive use of force."[10]

### E.      Violations of Smith-Cheatham's Constitutional Rights and His Damages

69.     City officials' failure to implement an appropriate disciplinary system and their failure to intervene to prevent misconduct-riddled, aggressive crowd-control measures with a

---

[9] Ryan Briggs and Max Marin, *Complaints Show Philly Police Escape Discipline for Violent Misconduct*, City and State Pennsylvania (Feb. 27, 2018), https://www.cityandstatepa.com/politics/2018/02/complaints-show-philly-police-escape-discipline-violent-misconduct/364775/

[10] Citizens Police Oversight Commission, *Philadelphia Citizens Police Oversight Commission Releases Report Highlighting Evaluation of Police Termination Arbitration Board*, City of Philadelphia (Jan. 29, 2025), https://www.phila.gov/2025-01-29-philadelphia-citizens-police-oversight-commission-releases-report-highlighting-evaluation-of-police-termination-arbitration-board/

11

history of misconduct, directly led to the violation of Smith-Cheatham's constitutional rights and the harms he suffered.

70.     There was no legal cause to justify the uses of force deployed against Smith-Cheatham on February 10, 2025.

71.     Smith-Cheatham was complying with all orders given to him by police. At no time did he commit any offense in violation of the laws of the City of Philadelphia, the Commonwealth of Pennsylvania, or the United States.

72.     At no point did Smith-Cheatham take any action that justified a baton strike to his head, much less multiple baton strikes to his head. A baton strike is considered "less lethal" force to be used by officers under limited circumstances.[11] A baton strike to the head is prohibited by PPD policy.[12] The violence used against Smith-Cheatham was a clear and disproportionate escalation of force to enforce a dispersal order, with which Smith-Cheatham was attempting to comply.

73.     Additionally, officers deployed force after Smith-Cheatham dropped to the ground and was under police control. The additional baton strike and further blows deployed by John Does 3-9 against a compliant civilian had no legal justification.

74.     Given the circumstances, the violence officers deployed against Smith-Cheatham was unreasonable.

---

[11] Philadelphia Police Department, *Directive 10.2: Use of Moderate/Limited Force*, 4 (July 11, 2022), https://www.phillypolice.com/wp-content/uploads/2024/11/D10.2-REV-7-11-22-REDACTED.pdf

[12] *Id.* at 14.

75.    Additionally, after this unlawful use of force, officers conspired to cover up their assault. As Smith-Cheatham sat there bleeding, officers delayed medical care and conspired to retroactively justify the force by falsely alleging he violated the disorderly conduct statute.

76.    Despite being aware of the unlawful use of force and Smith-Cheatham's innocence, at no point did any fellow officer intervene nor did any supervisor stop the unlawful acts of John Does 3-9.

77.    Despite there being no legal cause to justify Smith-Cheatham's arrest, Officers Santiago and Washington took him into custody until the following afternoon.

78.    At all times relevant to this Complaint, the conduct of the individual defendants was willful, reckless, and in callous disregard of Smith-Cheatham's rights under federal and state law.

79.    As a direct and proximate result of the conduct of defendants, Smith-Cheatham suffered and continues to suffer physical harm, emotional trauma, and loss of liberty.

V.    **Causes of Action**

**Count 1**
**Plaintiff v. Defendants John Does 1-9**
**Unlawful Use of Force**

80.    The actions and inactions of the John Doe defendants violated Smith-Cheatham's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from the unreasonable use of force.

**Count 2**
**Plaintiff v. Defendants Santiago, Washington, and John Does 1-9**
**Unlawful Arrest and Seizure**

81.    The actions and inactions of the defendants violated Smith-Cheatham's right under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unlawful arrest and seizure.

13

**Count 3**
**Plaintiff v. Defendant City of Philadelphia**
**Municipal Liability**

82.    The violations of Smith-Cheatham's constitutional rights under the Fourth, and

Fourteenth Amendments to the United States Constitution, Smith-Cheatham's damages, and the

conduct of the individual defendants were directly and proximately caused by the actions and/or

inactions of defendant City of Philadelphia, which encouraged, tolerated, ratified, and was

deliberately indifferent to the following policies, patterns, practices, and customs and to the need

for more or different training, supervision, investigation or discipline in the areas of:

   a.    The failure to discipline or properly monitor the actions of PPD officers;

   b.    The accepted practice of aggressive and abusive crowd control measures;
         and

   c.    The improper planning of a police response to mass gatherings allowing for
         PPD officers to use aggressive and violent tactics.

**Count 4**
**Plaintiff v. Defendants Santiago, Washington, and John Does 1-9**
**State Law Claims**

83.    The actions and inactions of defendants Santiago and Washington constitute the

torts of false arrest and false imprisonment under the laws of the Commonwealth of

Pennsylvania.

84.    The actions and inactions of John Doe defendants constitute the torts of assault,

battery, false arrest, and false imprisonment under the laws of the Commonwealth of

Pennsylvania.

14

## VI.    Requested Relief

Wherefore, Plaintiff Demond Smith-Cheatham respectfully requests:

A.  Compensatory damages as to all defendants;

B.  Punitive damages as to John Doe defendants and defendants Santiago and

Washington;

C.  Reasonable attorney's fees and costs as to all defendants;

D.  Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ *Eleanor Carpenter*
Eleanor Carpenter
ID No. 336200
Jonathan H. Feinberg
ID No. 88227
Grace Harris
ID No. 328968
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400

*Counsel for Plaintiff*[13]

---

[13] Counsel gratefully acknowledges the assistance of Daniel Talero, Penn Carey Law Class of 2026, in the preparation of this Complaint.